No. 25-1713

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

BBLI EDISON, LLC,
a Delaware limited liability company,

Plaintiff-Appellant,

v.

CITY OF CHICAGO,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 24-cv-04925
The Honorable Mary M. Rowland, Presiding

_____

**BRIEF OF DEFENDANT-APPELLEE**

_____

MARY B. RICHARDSON-LOWRY
Corporation Counsel
   of the City of Chicago
2 N. LaSalle Street, Suite 580
Chicago, Illinois 60602
(312) 744-2497

MYRIAM ZRECZNY KASPER
  Deputy Corporation Counsel
SUZANNE M. LOOSE
  Chief Assistant Corporation Counsel
ETHAN MEREL
  Assistant Corporation Counsel

# TABLE OF CONTENTS

———

**Page**

TABLE OF AUTHORITIES ................................................................iii

JURISDICTIONAL STATEMENT ................................................. 1

STATEMENT OF THE ISSUES .................................................... 1

STATEMENT OF THE CASE ....................................................... 2

SUMMARY OF ARGUMENT ....................................................... 5

ARGUMENT .................................................................................. 6

The KCRO's Relocation Assistance Fee Does Not Violate the Takings Clause.............................................................................................. 7

    A.    The KCRO does not effect a physical taking. ................. 8

    B.    The KCRO does not effect a regulatory taking. ........................... 18

        1.    Economic impact ........................................................ 19

        2.    Investment-backed expectations ........................... 21

        3.    Nature of the government action ......................... 23

        4.    The *Penn Central* factors remain the governing law....... 23

    C.    The KCRO serves a public purpose. ............................... 25

    D.    The KCRO does not violate the unconstitutional conditions doctrine................................................................................ 29

CONCLUSION ............................................................................... 33

# TABLE OF AUTHORITIES

————

**CASES**                                                                                      **Page(s)**

*Arkansas Game & Fish Commission v. United States,*
    568 U.S. 23 (2012) ............................................................................ 24

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................ 7

*Ballinger v. City of Oakland,*
    24 F.4th 1287 (9th Cir. 2022),
    *cert. denied* 142 S. Ct. 2777 ........................................... 12-13, 15, 18, 26, 31-32

*Bell v. City of Chicago,*
    835 F.3d 736 (7th Cir. 2016) ...................................................... 20-21

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................ 7

*Brown v. Legal Foundation of Washington,*
    538 U.S. 216 (2003) .......................................................................... 16

*Burger v. County of Macon,*
    942 F.3d 372 (7th Cir. 2019) ........................................................... 6

*Cedar Point Nursery v. Hassid,*
    594 U.S. 139 (2021) ................................................................... 8, 24, 31

*Cervantes, et al. v. BBLI Edison LLC, et al.,*
    24-CV-06098 (N.D. Ill.) .................................................................... 4

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.,*
    526 U.S. 687 (1999) .......................................................................... 31

*Commonwealth Edison Co. v. United States,*
    271 F.3d 1327 (Fed. Cir. 2001) ...................................................... 15

*Connolly v. Pension Benefit Guaranty Corp.,*
    475 U.S. 211 (1986) .......................................................................... 10

*Conyers v. City of Chicago,*
    10 F.4th 704 (7th Cir. 2021) ........................................................... 7

*Daniels v. Area Plan Commission of Allen County*,
    306 F.3d 445 (7th Cir. 2002) ..................................................... 26-28

*Dolan v. City of Tigard*,
    512 U.S. 374 (1994) ..................................................................... 30

*Eastern Enterprises v. Apfel*,
    524 U.S. 498 (1998) ................................................................ 14, 17

*Federal Communications Commission v. Florida Power Corp.*,
    480 U.S. 245 (1987) ........................................................... 9, 12, 23

*Goodpaster v. City of Indianapolis*,
    736 F.3d 1060 (7th Cir. 2013) .................................... 8, 18, 22-23, 25

*Guggenheim v. City of Goleta*,
    638 F.3d 1111 (9th Cir. 2010) (en banc) ..................................... 20

*Hawaii Housing Authority v. Midkiff*,
    467 U.S. 229 (1984) ................................................................ 27-28

*Horne v. Department of Agriculture*,
    576 U.S. 350 (2015) ..................................................................... 10

*Keene v. Consolidation Coal Co.*,
    645 F.3d 844 (7th Cir. 2011) ...................................................... 25

*Kelo v. City of New London*,
    545 U.S. 469 (2005) ................................................................ 27, 29

*Koontz v. St. Johns River Water Management District*,
    570 U.S. 595 (2013) .......................................................... 16-17, 29-32

*Kreuziger v. Milwaukee County*,
    60 F.4th 391 (7th Cir. 2023) ...................................................... 26

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005) ................................................... 7, 23-24, 26, 32

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982) ........................................................ 8-9, 11-12, 23

*McCarthy v. City of Cleveland*,
   626 F.3d 280 (6th Cir. 2010) ................................................................. 14-15, 18

*Mogan v. City of Chicago*,
   115 F.4th 841 (7th Cir. 2024) ................................................................. 19, 22, 25

*Murr v. Wisconsin*,
   582 U.S. 383 (2017) ................................................................................. 19, 24

*Nollan v. California Coastal Commission*,
   483 U.S. 825 (1987) ................................................................................. 30

*Pavlock v. Holcomb*,
   35 F.4th 581 (7th Cir. 2022) ................................................................... 7

*Penn Central Transportation Co. v. City of New York*,
   438 U.S. 104 (1978) ................................................................................. 18, 23

*Rancho de Calistoga v. City of Calistoga*,
   800 F.3d 1083 (9th Cir. 2015) ................................................................. 26

*Sheetz v. County of El Dorado*,
   601 U.S. 267 (2024) ................................................................................. 17, 24, 30-32

*Squires-Cannon v. Forest Preserve District of Cook County*,
   897 F.3d 797 (7th Cir. 2018) ................................................................... 25

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*,
   535 U.S. 302 (2002) ................................................................................. 18-20

*Tyler v. Hennepin County*,
   598 U.S. 631 (2023) ................................................................................. 16

*United States v. Rahimi*,
   602 U.S. 680 (2024) ................................................................................. 20

*United States v. Salerno*,
   481 U.S. 739 (1987) ................................................................................. 7, 19

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
   449 U.S. 155 (1980) ................................................................................. 7, 15

*Western & Southern Life Insurance Co. v. State Board of Equalization*,
   451 U.S. 648 (1981) ................................................................................. 27

*Yee v. City of Escondido*,
  503 U.S. 519 (1992) ............................................................ 10, 12, 22-23

*Zeyen v. Bonneville Joint District, # 93*,
  114 F.4th 1129 (9th Cir. 2024) ........................................ 15

**STATUTES AND OTHER AUTHORITIES**

U.S. Const. amend. V ............................................................ 7

Fed. R. Civ. P. 12(b)(6) ........................................................ 6

28 U.S.C. § 1291 .................................................................. 1

28 U.S.C. § 1331 .................................................................. 1

28 U.S.C. § 1343(a) .............................................................. 1

42 U.S.C. § 1983 .................................................................. 1

Municipal Code of Chicago, Ill. § 5-14-010 ................................ 2, 9, 28, 33

Municipal Code of Chicago, Ill. § 5-14-020 ................................ 2-3, 9

Municipal Code of Chicago, Ill. § 5-14-030 ................................ 3, 21

Municipal Code of Chicago, Ill. § 5-14-040 ................................ 2

Municipal Code of Chicago, Ill. § 5-14-050(a)(1) ........................ 3, 9, 20

Municipal Code of Chicago, Ill. § 5-14-050(b) ............................ 3

Municipal Code of Chicago, Ill. § 5-14-050(d) ............................ 3

Municipal Code of Chicago, Ill. § 5-14-050(f) ............................ 3

Municipal Code of Chicago, Ill. § 5-14-050(h) ............................ 3

Municipal Code of Chicago, Ill. § 5-14-070 ................................ 3

Municipal Code of Chicago, Ill. § 5-14-090 ................................ 3

Municipal Code of Chicago, Ill. § 7-28-220 ................................ 11

Municipal Code of Chicago, Ill. § 13-64-120 ................................................................. 11

Municipal Code of Chicago, Ill. § 13-164-010 *et seq.* ................................................. 11

Municipal Code of Chicago, Ill. § 13-196-410 ............................................................. 11

# JURISDICTIONAL STATEMENT

————

The jurisdictional statement of plaintiff-appellant BBLI Edison, LLC, is not complete and correct. BBLI sued the City of Chicago, alleging that the Keep Chicago Renting Ordinance ("KCRO") violated various provisions of the United States Constitution, including the Takings Clause, actionable under 42 U.S.C. § 1983. R. 8 (amended complaint). The district court had jurisdiction over those claims pursuant to 28 U.S.C. §§ 1331 and 1343(a).

On March 7, 2025, the district court dismissed all of BBLI's claims without prejudice. R. 32. On March 25, 2025, the district court dismissed the case with prejudice based on BBLI's status report announcing that it did not intend to further amend its complaint. R. 33; R. 34. The court entered final judgment that same day. R. 35. On April 24, 2025, BBLI filed a notice of appeal. R. 36. This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

————

1.     Whether the district court correctly held that the KCRO's relocation fee is not, on its face, a taking that violates the Takings Clause of the United States Constitution.

2.     Whether the district court correctly held that the relocation fee of the KCRO does not, on its face, constitute an impermissible exaction in violation of the unconstitutional conditions doctrine.

## STATEMENT OF THE CASE

———

On July 21, 2021, the Chicago City Council enacted the KCRO "to protect and promote the health, safety, and welfare of [the City's] residents and mitigate the damaging effects on our communities of foreclosures, which individually are catastrophic for the families and tenants who lose their homes, and collectively can economically destabilize an otherwise healthy neighborhood." Municipal Code of Chicago, Ill. § 5-14-010. To achieve this goal, the KCRO regulates the relationship between the new owners of foreclosed rental properties and the buildings' existing tenants. A "foreclosed rental property" is "a building containing one or more dwelling units that are used as rental units" for which "legal and equitable interests . . . were terminated by a foreclosure action," and "one or more of the rental units are occupied." *Id.* § 5-14-020. And a qualified tenant "is a tenant in a foreclosed rental property on the day that a person becomes the owner of that property," and "has a bona fide rental agreement to occupy the rental unit as the tenant's principal residence." *Id.* § 5-14-020.

Pursuant to the KCRO, the new owner of a foreclosed rental property must take certain actions when it becomes the owner. *See id.* § 5-14-040 (initial steps must be completed "no later than 21 days after a person becomes the owner of a foreclosed rental property"). One requirement is that the owner "pay a one-time relocation assistance fee of $10,600 to a qualified tenant unless the owner negotiates in good faith for a new rental agreement that lasts at least 12 months, offers such qualified tenant a new rental agreement according to these terms, and

2

the qualified tenant accepts the owner's offer in writing." *Id.* § 5-14-050(a)(1). A person becomes the "owner," and thereby triggers this requirement, if they either purchase a "foreclosed rental property . . . pursuant to a judicial sale" or are a mortgagee that accepts "a deed in lieu of foreclosure." *Id.* § 5-14-020. The KCRO does not alter an owner's ability to evict tenants who have breached their leases, and "[i]f a qualified tenant is evicted for cause, the owner shall not be liable for any relocation assistance." *Id.* § 5-14-050(h). The KCRO also authorizes owners to withhold any back rent due from the relocation assistance payment. *Id.* § 5-14-050(d). Certain types of owners are excluded from the ordinance, including "an owner of a foreclosed rental property who was the owner prior to the effective date of this chapter." *Id.* § 5-14-030.

If an owner fails to pay the relocation assistance payment within seven days of a tenant vacating a rental unit, *id.* § 5-14-050(b), the "tenant may bring a private cause of action" to recover "two times the relocation assistance fee" and reasonable attorney's fees, *id.* §§ 5-14-050(f); 5-14-070. The City may also enforce the KCRO by bringing an action in the City's Department of Administrative Hearings. *Id.* § 5-14-090.

On February 9, 2024, BBLI acquired ownership of the building located at 5200 N. Sheridan Road through foreclosure proceedings. R. 9 ¶¶ 1, 26, 29. The building contains more than 200 residential rental units as well as first-story retail units. R. 7-1 ¶ 8. The former owner of the building ignored various building code violations, R. 8 ¶ 27, and the building has continued to be cited for additional

building code violations under BBLI's ownership, R. 15 at 24-29.

BBLI failed to execute new lease agreements with at least some of the building's tenants, and then refused to provide those tenants with the required relocation assistance payment. *See* R. 7-1 ¶¶ 12, 29-35; R. 7-1 at 26. In response to its violations of the KCRO, the City brought an enforcement action against BBLI, R. 7-1 ¶ 18; R. 8 ¶ 43, and some of BBLI's tenants filed a putative class action, R. 7-1 ¶ 54; R. 8 ¶ 43; *see also Cervantes, et al. v. BBLI Edison LLC, et al.*, 24-CV-06098 (N.D. Ill.). That putative class action remains pending, and the district court denied BBLI's motion to dismiss it on June 9, 2025. *See Cervantes*, 24-CV-06098 (N.D. Ill.) at Dkt. 27.

BBLI separately filed this lawsuit against the City, seeking to enjoin enforcement of the KCRO based on various theories that the KCRO is unconstitutional. R. 8. Relevant here, BBLI alleged violations of the Takings Clause. R. 8 ¶¶ 121-42.[1] The City moved to dismiss the complaint for failure to state a claim, R. 17, which the district court granted, R. 32. The district court explained that the KCRO serves a public purpose, does not amount to an unconstitutional exaction, and does not effect a per se or regulatory taking of property. R. 32 at 11-18.

BBLI appeals, R. 36, challenging only "the district court's dismissal of its federal takings and unconstitutional condition/exaction claims," *see* Appellant's

---

[1] BBLI also alleged that the KCRO violated the Due Process Clause of the Fourteenth Amendment, was void for vagueness, and violated its right to equal protection. R. 8. In this appeal, BBLI challenges only its claims based on the Takings Clause and has abandoned the others.

Opening Brief ("BBLI Br.") 8.

## SUMMARY OF ARGUMENT

———

Years after the KCRO was enacted, BBLI acquired a foreclosed, tenant-occupied rental building and thus subjected itself to the host of regulations that govern landlord-tenant relationships, including those in the KCRO. The KCRO requires BBLI to negotiate, in good faith, lease renewals with the tenants of its foreclosed property, and if no renewal is agreed to, provide such tenants with relocation assistance in the form of a one-time payment. BBLI failed to execute lease renewals with some of its tenants and then refused to make the required payments to those tenants. Instead, BBLI sued the City, claiming that the relocation assistance fee provision of the KCRO, on its face, amounts to either a taking of property or an unconstitutional condition on its property, in violation of the Takings Clause.

The district court correctly granted the City's motion to dismiss BBLI's claims. First, the KCRO does not cause a "physical" taking of property because it neither mandates an occupation of foreclosed residential property nor otherwise physically takes a specific, vested monetary interest of the property's owner. Second, the KCRO does not cause a partial regulatory taking of property because all three *Penn Central* test factors – the economic impact of the regulation, the degree of interference with the owner's investment-based expectations, and the nature of the government action – weigh against such a finding. Third, whether the KCRO serves a "public use" is irrelevant in this case, but regardless, the law is motivated

by a public purpose. Fourth, the KCRO does not run afoul of the Takings Clause by imposing an unconstitutional condition on property rights because it does not condition a government benefit, such as a permit, on an exaction from the property owner. In addition, the KCRO is a constitutional, direct regulation of the landlord-tenant relationship, not an indirect means to coerce property owners to give up property, which is what the unconstitutional conditions doctrine guards against. To the extent the doctrine applies, there is an essential nexus and rough proportionality between the relocation fee and the social costs of foreclosure. For these reasons, the district court's judgment should be affirmed.

## ARGUMENT

———

BBLI acquired a foreclosed rental property well after the enactment of the KCRO, but then refused to make the required relocation assistance payments to its departing tenants. Instead, BBLI waited for the City to initiate enforcement proceedings and for tenants to file suit, and then it separately sued the City to enjoin enforcement of the ordinance. BBLI, however, failed to state a claim that the relocation assistance payments required under the KCRO amount to either a taking or an unconstitutional condition in violation of the Takings Clause. The district court correctly granted the City's motion to dismiss.

This court "review[s] *de novo* a district court's grant of a motion to dismiss for failure to state a claim." *Burger v. County of Macon*, 942 F.3d 372, 374 (7th Cir. 2019). To survive a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must "state a claim for relief that is plausible on its face," *Bell Atlantic*

*Corp. v. Twombl*y, 550 U.S. 544, 570 (2007), which requires that it contain facts sufficient for the court to draw "a reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A facial challenge to a legislative [a]ct is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [a]ct would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Under these standards, the district court's judgment should be affirmed.

**The KCRO's Relocation Assistance Fee Does Not Violate the Takings Clause.**

The KCRO's relocation assistance fee does not, on its face, violate the Takings Clause. The Fifth Amendment's Takings Clause provides that "private property [shall not] be taken for public use, without just compensation," U.S. Const. amend. V., and it applies to the states through the Fourteenth Amendment, *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980); *Pavlock v. Holcomb*, 35 F.4th 581, 586 (7th Cir. 2022). Takings claims require the plaintiff to show: "(1) that the governmental entity 'took' his property, . . . (2) that the taking was for a public use, and (3) that, no matter what type of property (real or personal) was taken, the government has not paid just compensation." *Conyers v. City of Chicago*, 10 F.4th 704, 710-11 (7th Cir. 2021) (internal citations omitted).

To establish that a government regulation "took" private property, a plaintiff may proceed under one of four approaches: "a 'physical' taking, a *Lucas*-type 'total regulatory taking,' a *Penn Central* taking, or a land-use exaction violating the standards set forth in *Nollan* and *Dolan*." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S.

528, 548 (2005); *see also Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1073-74 (7th Cir. 2013) (explaining that "[t]akings jurisprudence encompasses four basic claims"). BBLI argues that by its relocation assistance fee requirement, the KCRO "takes" property based on three of these approaches – a physical taking, a partial regulatory taking, and a land-use exaction. It also argues that the relocation payments do not serve a public purpose. But the KCRO, analyzed under any approach, is a valid regulation of the landlord-tenant relationship that does not violate the Takings Clause.

### A.    The KCRO does not effect a physical taking.

The KCRO does not amount to a per se, physical taking of BBLI's money by requiring BBLI to pay relocation fees to tenants. To constitute a physical taking, there must be an "occupation" of the property, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434 (1982), which can occur when a government regulation "physically appropriates [the] property," *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021). Contrary to BBLI's arguments, BBLI Br. 22-23, there is no physical taking here.

The KCRO does not authorize the government to occupy or physically appropriate any property, including money. It is, instead, a landlord-tenant regulation that requires, under certain circumstances, payments be made to tenants in order "to mitigate the damaging effects on our communities of foreclosures," and "to preserve, protect, maintain, and improve rental property and prevent occupied buildings from becoming vacant after foreclosures." Municipal Code of Chicago, Ill.

8

§ 5-14-010. Specifically, the KCRO requires the new owner of a tenant-occupied, foreclosed rental property to "pay a one-time relocation assistance fee of $10,600 to a qualified tenant unless the owner negotiates in good faith for a new rental agreement that lasts at least 12 months, offers such qualified tenant a new rental agreement according to these terms, and the qualified tenant accepts the owner's offer in writing." *Id.* § 5-14-050(a)(1). A property owner triggers this requirement if they either purchase a foreclosed rental property pursuant to a judicial sale or are a mortgagee that accepts a deed in lieu of foreclosure. *Id.* § 5-14-020. In other words, the government does not take any property. Instead, the KCRO may require a payment to tenants as a cost associated with a landowner's acquisition of certain types of property and doing business in the highly regulated residential rental industry.

The Supreme Court has consistently held that the government has "broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Loretto*, 458 U.S. at 440 (listing cases). Indeed, the Court has explicitly held that "statutes regulating the economic relations of landlords and tenants are not *per se* takings," and absent the government's "physical occupation" of the residential property, such regulations are "analyzed under the multifactor inquiry generally applicable to nonpossessory governmental activity," *Federal Communications Commission v. Florida Power Corp.*, 480 U.S. 245, 252 (1987), known as the *Penn Central* factors, *Loretto,* 458 U.S. at 440; *see*

9

*also Yee v. City of Escondido*, 503 U.S. 519, 532 (1992) (a regulation of rental property that "does not authorize an unwanted physical occupation . . . does not amount to a *per se* taking"). That regulatory taking analysis is explained in subsection B below.

BBLI attempts to create the appearance of a physical takings claim where none exists by ignoring the government's broad power to regulate the landlord-tenant relationship and focusing on the mere transfer of money in isolation. That is improper. As the Supreme Court has explained, "[g]iven the propriety of the governmental power to regulate, it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another." *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 223 (1986). Indeed, there are many types of government regulation, particularly in the landlord-tenant or land use contexts, that involve a transfer of wealth between private parties. For example, "[o]rdinary rent control often transfers wealth from landlords to tenants," and "[t]raditional zoning regulations can transfer wealth from those whose activities are prohibited to their neighbors." *Yee*, 503 U.S. at 529-30. But "the existence of the transfer in itself does not convert regulation into physical invasion." *Id.*; *see Horne v. Department of Agriculture*, 576 U.S. 350, 362 (2015) ("A physical taking" and "a regulation" on property "may have the same economic impact," but the Constitution "is concerned with means as well as ends.").

Thus, while many landlord-tenant regulations may make ownership of property less profitable, that does not mean they are physical takings. Habitability

10

standards, rent control, restrictions on evictions, notice requirements for rent increases – all of these arguably make the ownership and operation of such properties less profitable. And many such regulations require landlords to expend money for the tenant's benefit – often in lieu of the tenant having to make the expense themselves – but they do not constitute physical takings of the landlord's money. *See Loretto*, 458 U.S. at 440 (the Takings Clause does not limit "the State's power to require landlords to . . . provide utility connections, mailboxes, smoke detectors, fire extinguishers, and the like").[2] The KCRO, similarly, mandates that those who acquire foreclosed, occupied rental properties provide their tenants with relocation assistance if agreement on a new lease is not reached. Depending on the circumstances of any particular building, this may make the acquisition of foreclosed, tenant-occupied residential property less profitable, but that does not make it a per se taking. It is merely another cost of doing business that is not a "physical taking" of the landlord's money.

BBLI argues that the City may not "appropriat[e]" its money "simply by including it in a regulation of BBLI's right to own and use and rent its foreclosed real property." BBLI Br. 23. But, in fact, the Supreme Court has recognized that governmental entities may "require landlords to . . . provide" things of value for their tenants' benefit, "[s]o long as the[] regulations do not require the landlord to

---

[2] The City, for example, has regulations mandating that landlords, at their expense, provide tenants with smoke detectors, Municipal Code of Chicago, Ill. § 13-64-120; a minimum amount of heating, *id.* § 13-196-410; refuse containers, *id.* § 7-28-220; and various security locks for building entrances, doors, and windows, *id.* § 13-164-010 *et seq.*

suffer the physical occupation of a portion of his building." *Loretto*, 458 U.S. at 440.
Such regulation of the landlord-tenant relationship is acceptable in large part
because the property owner has voluntarily entered into the industry as regulated.
S*ee Florida Power Corp.*, 480 U.S. at 252 ("regulating the economic relations of
landlords and tenants" is permissible because landlords "have voluntarily entered
into leases"). So, for example, "[w]hen a landowner decides to rent his land to
tenants, the government may place ceilings on the rents the landowner can charge,
or require the landowner to accept tenants he does not like, without automatically
having to pay compensation." *Yee*, 503 U.S. at 529 (internal citations omitted). In
voluntarily acquiring a foreclosed, tenant-occupied property, BBLI chose to subject
itself to the whole host of existing regulations governing that industry.

Furthermore, BBLI's argument that governments cannot require monetary
payments as part of a broader regulation of property could upend any number of
other common public welfare regulations. For example, nearly every state requires
car owners and operators to carry vehicle liability insurance. *See, e.g.*, 625 ILCS
§ 5/7-601. Such laws are, in effect, mandates that vehicle owners pay money to
private parties – insurance companies – in order to register ownership of their
property and exercise the right to operate it. When a law is validly regulating the
ownership and operation of certain forms of property – be it vehicles or apartment
buildings – the mere obligation that money be paid to a private party in certain
scenarios is not a "physical taking" of money.

The Ninth Circuit, in *Ballinger v. City of Oakland*, 24 F.4th 1287 (9th Cir.

2022), *cert. denied* 142 S. Ct. 2777, rejected a near-identical takings claim against Oakland's comparable relocation fee ordinance. The Oakland ordinance "require[d] landlords re-taking occupancy of their homes upon the expiration of a lease to pay tenants a relocation payment," and "the payment need not be spent on relocation costs." *Id.* at 1291. If a landlord failed in bad faith to make the payment, "a tenant [could] bring an action against the landlord for injunctive relief, the relocation payment, attorneys' fees, and treble damages." *Id.* In *Ballinger*, the landlord had to pay its tenants a relocation payment of more than $6,000. *Id.* The Ninth Circuit held that the ordinance did not violate the Takings Clause because "the relocation fee required by the Ordinance [was] a monetary obligation triggered by a property owner's actions with respect to the use of their property, not a burden on the property owner's interest in the property." *Ballinger*, 24 F.4th at 1296-97. The relocation payment was merely a "transaction cost" of operating in the rental market and there was "little difference between lawful regulations, like rent control, and the Ordinance's regulation of the landlord-tenant relationship." *Id.* at 1293. Accordingly, the court held that "the relocation fee required by the Ordinance was a regulation of the landlord-tenant relationship" and not a "per se[] taking" of the landlord's money. *Id.* at 1292. The Ninth Circuit's sound analysis applies in equal measure to the KCRO.

To be sure, as BBLI observes, money can be a form of property protected by the Takings Clause, BBLI Br. 12-16, but that is true only under limited circumstances – namely, when a law targets specific, identified sources of money, as

opposed to imposing a general regulatory obligation to pay money. The Supreme Court addressed this issue in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), which concerned a statute that retroactively imposed obligations on coal operators to pay for retired miners' medical expenses. *Id.* at 514-17. Five justices – Justice Kennedy in concurrence and four justices in dissent – agreed that regulatory actions requiring the general obligation to pay money are not takings. *See id.* at 540 (Kennedy, J., concurring) ("The law simply imposes an obligation to perform an act, the payment of benefits. The statute is indifferent as to how the regulated entity elects to comply or the property it uses to do so. To the extent it affects property interests, it does so in a manner similar to many laws[.]"); *see also id.* at 555 (Breyer, J., dissenting) ("Here there is no specific fund of money; there is only a general liability; and that liability runs not to the Government, but to third parties."). Even the plurality opinion, which found that the law amounted to a regulatory taking, held that the law did not present a "'classic taking' in which the government directly appropriates private property for its own use." *Id.* at 522, 530. All nine justices, therefore, agreed that the general monetary obligation imposed by the statute was not a per se or physical taking of the coal operators' money.

While the Court's split opinion in *Eastern Enterprises* has led the courts of appeals to different analytical approaches, "all circuits that have addressed the issue have uniformly found that a taking does not occur when the statute in question imposes a monetary assessment that does not affect a specific interest in property." *McCarthy v. City of Cleveland*, 626 F.3d 280, 285 (6th Cir. 2010)

(collecting cases). The courts of appeals agree, therefore, that the type of payment provision included in the KCRO, which does not target specific money, does not give rise to a claim that "money" is physically taken. *See, e.g.*, *Ballinger*, 24 F.4th at 1295 (while "money can be the subject of a taking . . . here, the City's Ordinance imposes a general obligation to pay money and does not identify any specific fund of money; therefore, it does not effectuate an unconstitutional physical taking"); *McCarthy*, 626 F.3d at 284 ("a per se taking of funds" occurs when "the state law at issue operated to seize a sum of money from a specific fund" and not "merely impose an obligation on a party to pay money on the happening of a contingency"); *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1340 (Fed. Cir. 2001) ("while a taking may occur when a specific fund of money is involved, the mere imposition of an obligation to pay money, as here, does not give rise to a claim under the Takings Clause"); *see also Zeyen v. Bonneville Joint District, # 93*, 114 F.4th 1129, 1146 (9th Cir. 2024) (when "a fee was charged on the happening of a contingency," it "lacks the direct governmental appropriation of a specific, vested monetary interest necessary to give rise to a per se monetary takings claim").

Indeed, both before and after *Eastern Enterprises*, the Supreme Court has on a number of occasions held that the government can effect a per se taking when it targets particular monetary funds for government use. In *Webb's Fabulous Pharmacies*, 449 U.S. 155, for example, the Court found that a Florida law effected a taking where it permitted county court clerks to keep the interest earned on specific funds paid to the court in interpleader actions. *Id.* at 163-64. As another

example, in *Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003), the Court held that a state program effected a *per se* taking of private property where it required the interest earned by lawyers' trust accounts be turned over to the states' legal aid charities. *Id.* at 232-35, 240. And recently, in *Tyler v. Hennepin County*, 598 U.S. 631 (2023), the Court decided that a county effected a "classic taking" when it kept the excess profits from a forced tax sale of a home after the property was sold for more than the amount owed for unpaid property taxes. *Id.* at 639. In each of these instances, the object of the prohibited taking was a specific pot of money, not a general obligation to pay as part of a regulation.

Despite this precedent, BBLI argues that the Supreme Court's opinion in *Koontz v. St. Johns River Water Management District*, 570 U.S. 595 (2013), "confirmed that a governmental requirement that a real property owner cede money is analyzed as a per se taking of property." BBLI Br. 15-16. BBLI mischaracterizes the holding of *Koontz*, which was much narrower. *Koontz* involved an unconstitutional conditions claim where a real property owner sought a land-use permit to develop his property, and the government conditioned its grant of the permit on the owner's either granting the government a large easement on its property or paying for improvements to other government-owned lands located miles away. *Koontz*, 570 U.S. at 602.[3] The Court observed that "if the government had directly seized the easement[] it sought to obtain through the permitting

---

[3] For the reasons discussed in subsection D, the KCRO does not implicate the unconstitutional conditions doctrine, which is the only claim *Koontz* addressed. Although *Koontz* discussed the Court's takings precedent, the case did not involve a physical takings claim.

process, it would have committed a *per se* taking," and so a monetary payment "in lieu of" the easement was the "functional[] equivalent" of the land-use exaction of physical property. *Koontz*, 570 U.S. at 612; *see also Sheetz v. County of El Dorado*, 601 U.S. 267, 274 (2024) (*Koontz* means the restriction on exactions "applies regardless of whether the condition requires the landowner to relinquish property or requires her to pay a monetary exaction instead of relinquishing the property"). Importantly, *Koontz* left *Eastern Enterprises* undisturbed. The Court explained that its decision was consistent with *Eastern Enterprises* – citing Justice Kennedy in concurrence and the four justices in dissent – because unlike payment under a generally applicable regulatory obligation, the exaction in *Koontz* "'operate[d] upon . . . an identified property interest' by directing the owner of *a particular piece of property* to make a monetary payment." *Id.* at 613 (quoting *Eastern Enterprises*, 524 U.S. at 540) (emphasis added); *see also Sheetz*, 601 U.S. at 284 (the Court has only addressed fees that "target[] a particular development" or "specific parcels of property," not fees "imposed on a class of properties") (Kavanaugh, J., concurring).

Unlike the permitting decision in *Koontz*, the KCRO is not concerned with any specific parcel of land or source of money.[4] Rather, it is a general regulatory obligation that governs the landlord-tenant relationship in the context of foreclosures, which applies to BBLI only because it chose to participate in the

---

[4] BBLI brings only a facial challenge, not an as-applied challenge. *See* R. 8. *Koontz*, and the other unconstitutional conditions cases it relies on, are all as-applied challenges to specific permitting exactions levied on specific properties seeking land-use permits. The discussion in *Koontz*, therefore, concerns government action that directly targeted a single, identified property.

regulated industry by acquiring ownership of foreclosed, tenant-occupied property. As the Ninth Circuit explained in *Ballinger*, "*Koontz* cuts against" plaintiff's argument because a relocation fee is "a mere obligation to pay in relation to the use of one's property" and not the "functional[] equivalent . . . to a taking of an interest in the real property itself." 24 F.4th at 1296-97; *see also McCarthy*, 626 F.3d at 286 ("the Takings Clause is not an appropriate vehicle to challenge the power of [a legislature] to impose a mere monetary obligation without regard to an identifiable property interest") (internal quotation marks omitted). BBLI's claim that the relocation assistance payment is a physical taking of its property within the meaning of the Takings Clause is, therefore, without merit.

### B.    The KCRO does not effect a regulatory taking.

BBLI alternatively argues that the KCRO effects a partial regulatory taking of property based on *Penn Central* and its progeny. BBLI Br. 28-30. A court applying *Penn Central* considers three factors to determine whether a regulation amounts to a taking when property is not physically taken or stripped of all economically viable use: (1) "the economic impact of the regulation"; (2) "the degree of interference with the owner's reasonable investment-based expectations"; and (3) "the nature of the government action." *Goodpaster*, 736 F.3d at 1074 (citing *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978)). This regulatory takings test "is characterized by essentially ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning*

*Agency*, 535 U.S. 302, 322 (2002) (internal citation omitted). None of the *Penn Central* factors weigh in favor of BBLI's claim.

### 1. Economic impact

First, BBLI's amended complaint contains no allegations demonstrating that the KCRO impacts the value of foreclosed tenant-occupied residential property. The economic impact part of the "test for [a] regulatory taking requires [the court] to compare the value that has been taken from the property with the value that remains in the property." *Murr v. Wisconsin*, 582 U.S. 383, 395 (2017); *Mogan v. City of Chicago*, 115 F.4th 841, 847 (7th Cir. 2024) (same). As previously discussed, the relocation fee is best understood as a transaction cost of acquiring certain properties and entering the highly regulated rental industry. As such, the potential expense of the fee cannot be analyzed without regard for the positive economic value and opportunity of acquiring property covered by the KCRO. BBLI makes no allegation that the monetary liability the relocation fee requirement imposes outweighs the economic benefits of acquiring a property covered by the KCRO.

BBLI argues that "requiring [it] to pay $10,600 to each tenant that chooses to take the money" is a considerable financial burden, BBLI Br. 29, because, at that rate, "[t]he KCRO could ultimately require BBLI to pay over two million dollars in relocation fees" if every tenant in its building took the payment, *id.* at 27. But BBLI's amended complaint pleaded only a "facial" takings claim, *see* R. 8 at 22-23, which requires BBLI to "establish that no set of circumstances exists under which the [ordinance] would be valid," *Salerno*, 481 U.S. at 745. To prevail, therefore, a

plaintiff must show that the "particular law is unconstitutional in all its actual applications." *Bell v. City of Chicago*, 835 F.3d 736, 740-41 (7th Cir. 2016). Conversely, "the [g]overnment need only demonstrate that [the regulation] is constitutional in some of its applications." *United States v. Rahimi*, 602 U.S. 680, 693 (2024). And, as the Court has explained, in the specific context of a facial regulatory takings claim, "the narrow inquiry before the Court of Appeals [is] whether the mere enactment of the regulations constitute[s] a taking." *Tahoe-Sierra Preservation Council*, 535 U.S. at 318; *see Guggenheim v. City of Goleta*, 638 F.3d 1111, 1119 (9th Cir. 2010) (en banc) (a facial regulatory takings challenge measures whether "the very enactment of the statute has reduced the value of the property," which is "a single harm, measurable and compensable when the statute is passed").

BBLI does not allege the KCRO is unconstitutional in all its applications. Nor could it plausibly do so because the KCRO, by nature of its enactment, does not automatically require payments to tenants of a foreclosed rental property; payment is required only if and when a landlord and tenant do not enter into a new rental agreement. *See* Municipal Code of Chicago, Ill. § 5-14-050(a)(1). The specific amount of money any particular owner may ultimately pay, as well as the economic impact of those payments in relation to the value of the underlying property, are case-specific, fact-dependent inquiries reserved for as-applied challenges.

And those facts relevant to the economic impact analysis will vary greatly depending on property-specific circumstances. For example, the percentage of tenants who may choose to receive the payment could be greater in buildings where

living conditions are poorer. As another example, if a building were valued at over a billion dollars, the relative economic impact of a $10,600 per tenant transaction cost would be marginal compared to the impact for buildings valued at less than a million dollars. All of these case-specific variables may be relevant for deciding as-applied challenges. But BBLI's focus on the *maximum* amount of money it might need to pay departing tenants – the most extreme, as-applied scenario of the KCRO – falls far short of an allegation that there is no set of circumstances under which the ordinance would be valid.[5] BBLI, therefore, has not adequately alleged that the economic impact factor weighs in its favor.

### 2.  Investment-backed expectations

Second, BBLI has not alleged that the KCRO, on its face, interferes with the reasonable investment-backed expectations of property owners. Such an allegation would be implausible. The current version of the KCRO was enacted in July 2021, and it covers only property owners who acquired foreclosed property after its enactment. *See* Municipal Code of Chicago, Ill. § 5-14-030. That includes BBLI, which acquired ownership of the covered apartment building in February 2024, nearly three years later. *See Bell*, 835 F.3d at 741 (for a facial challenge, "a particular law [must be] unconstitutional in all its actual applications, *including its application to them*") (emphasis added). As this court has explained, a plaintiff cannot "demonstrate that [an] Ordinance has interfered with any reasonable

---

[5] Even for the KCRO's application to it, BBLI has neither alleged that such an extreme scenario is occurring at its building, nor that the cost of the relocation payments would render its acquisition of the building unprofitable.

investment-backed expectations" when, as here, the plaintiff was "on actual notice before purchasing the property." *Mogan*, 115 F.4th at 848-49; *see also Goodpaster*, 736 F.3d at 1074 (ordinance did not interfere with investment-backed expectations when it was already in place for years and its further expansion was no surprise).

BBLI argues that this "focus is improper" because the relevant property interest is "a monetary one" where the KCRO "strips BBLI of its fundamental right to exclude others from its monetary assets" and interrupts its expectation that it could "control its own funds[] and decide where and to whom they will flow." BBLI Br. 27, 29. That argument makes no sense. Again, BBLI chose to acquire ownership of the foreclosed property years after the enactment of the KCRO, when it should have known that it was subjecting itself to the possibility of paying monetary relocation assistance fees. In other words, BBLI knowingly and voluntarily subjected itself – and its money – to a situation where it would *not* be in complete control of how many tenants might choose the relocation fee instead of signing a new lease. In this respect, the KCRO is not materially different from other landlord-tenant regulations that permissibly "place ceilings on the rents the landowner can charge[] or require the landowner to accept tenants he does not like" simply because the "landowner decide[d] to rent his land to tenants." *Yee*, 503 U.S. at 529 (internal citation omitted). Because the KCRO was in effect at all relevant times, BBLI could not have reasonably expected to avoid relocation payments. This factor weighs squarely against BBLI.

22

### 3. Nature of the government action

Third, and last, the nature of the government action does not support a takings claim. It is well-established that municipalities have "broad power" to regulate the landlord-tenant relationship "without paying compensation for all economic injuries that such regulation entails." *Loretto*, 458 U.S. at 440; *see also Yee*, 503 U.S. at 532; *Florida Power Corp.*, 480 U.S. at 252. As the district court correctly explained, the "KCRO falls squarely within the category of 'public program[s] adjusting the benefits and burdens of economic life to promote the common good'" that do not amount to regulatory takings. R. 32 at 17-18 (quoting *Penn Central*, 438 U.S. at 124). Accordingly, the character of the KCRO "weighs heavily against finding a taking." *Goodpaster*, 736 F.3d at 1074-75.

### 4. The *Penn Central* factors remain the governing law.

BBLI attempts to avoid consideration of the second and third *Penn Central* factors altogether by arguing that they are "outdated and improper," urging that the "severity of the burden" on property rights is "the focus of the regulatory takings inquiry." BBLI Br. 24. Specifically, BBLI contends that the property owner's investment-backed expectations and the nature of the governmental action should play no part in the regulatory takings analysis, and attributes the elimination of these factors to *Lingle*. BBLI Br. 25-26 (citing 544 U.S. at 539-40). *Lingle* announced no such change. On the contrary, the Court reiterated that the *Penn Central* factors "have served as the principal guidelines for resolving regulatory takings claims." *Lingle*, 544 U.S. at 539. When the Court stated that the

determination of "the severity of the burden that government imposes upon private property rights" was central to the adjudication of takings claims, it was explaining that the *Penn Central* test is *how* a court assesses the severity in the partial regulatory takings context. 544 U.S. at 539-40. Indeed, BBLI seems to recognize that it is advocating for a change to takings law that only the Supreme Court can make. *See* BBLI Br. 26 n.3. BBLI cites no case that overturned or changed the *Penn Central* test.

Moreover, in the years since *Lingle*, the Court has continued to recognize the applicability of the *Penn Central* factors analyzing both investment-backed expectations and the nature of the government action. *See, e.g.*, *Sheetz,* 601 U.S. at 274 (reiterating the importance of whether a use restriction "frustrates [an] owner's investment-backed expectations"); *Cedar Point Nursery*, 594 U.S. at 148 (the factors used "[t]o determine whether a use restriction effects a taking" include the regulation's "interference with reasonable investment-backed expectations" and "the character of the government action"); *Murr*, 582 U.S. at 393 (the Court considers "the extent to which the regulation has interfered with distinct investment-backed expectations" and "the character of the governmental action" in cases where "a regulation impedes the use of property without depriving the owner of all economically beneficial use"); *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23, 38 (2012) ("The determination whether a taking has occurred includes consideration of the property owner's distinct investment-backed expectations.").

Consistent with that precedent, this court has likewise continued to rely on both investment-backed expectations and the nature of the government action in deciding regulatory takings cases in recent years. *See, e.g.*, *Mogan*, 115 F.4th at 848 (plaintiff failed to "demonstrate that the Ordinance . . . interfered with any reasonable investment-backed expectations"); *Squires-Cannon v. Forest Preserve District of Cook County*, 897 F.3d 797, 802 (7th Cir. 2018) (considering the ordinance's "interference with reasonable investment-backed expectations" and holding that "[t]he character of this government action defeats the [plaintiffs'] claim"); *Goodpaster*, 736 F.3d at 1074-75 (deciding that "the nature of the government action" factor "weighs heavily against finding a taking," and explaining that "[w]hile the [regulation] may interfere with some reasonable investment-based expectations, it does not do so to a degree significant enough to find a taking"); *Keene v. Consolidation Coal Co.*, 645 F.3d 844, 850 (7th Cir. 2011) ("the character of the governmental action" is a factor that has "particular significance" to the regulatory takings inquiry).

In sum, the three *Penn Central* factors are the governing law, and each factor supports the conclusion that the KCRO does not effect a regulatory taking.

## C.     The KCRO serves a public purpose.

BBLI also argues that the KCRO does not serve a "public use" because it takes money from private property owners and gives it to private tenants without ensuring that tenants will use it for housing costs. BBLI Br. 16-20. Although BBLI's argument is incorrect, this court need not address the "public use" inquiry to resolve

25

this case.[6] The "threshold showing" for a "federal takings-clause claim" is that "the government has *taken* . . . private property belonging to the plaintiff." *Kreuziger v. Milwaukee County*, 60 F.4th 391, 394 (7th Cir. 2023) (emphasis added). BBLI's claim does not pass this threshold because there has been no taking within the meaning of the Takings Clause. And if the relocation fee does not effect a taking, then there is no claim based on the Takings Clause, regardless of the KCRO's purpose. *See, e.g.*, *Ballinger*, 24 F.4th at 1297 n.6 ("Because we hold that the relocation fee is not a taking, we need not address the [argument] that the relocation fee is taking for a private, rather than public, purpose."); *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1093 (9th Cir. 2015) (same). In addition, even if the relocation fee *were* a taking, this court would still not need to resolve whether the KCRO serves a public purpose. A valid taking requires the payment of just compensation, and the KCRO undisputedly does not provide a mechanism for compensation by the City. *See Daniels v. Area Plan Commission of Allen County*, 306 F.3d 445, 468 (7th Cir. 2002) ("[T]he Public Use Clause is only violated if a person's property is taken for the benefit of another private person without a justifying public purpose, even though compensation be paid.") (internal quotation marks omitted).

---

[6] BBLI styles the "public use" requirement of the Takings Clause as a stand-alone cause of action. *See* R. 8 ¶¶ 121-31; BBLI Br. 16-20. That is not correct. "Rather, such a public-use challenge must function as part of the larger regulatory takings claim," and it "is not a separately cognizable claim." *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1087, 1092 (9th Cir. 2015); *see Lingle*, 544 U.S. at 548 (listing the four ways by which a plaintiff may challenge "an uncompensated taking of private property," none of which is a claim based on the "public use" clause in isolation).

In any event, the KCRO satisfies the public use requirement. The burden on the government to justify the "public use" of a taking "is remarkably light." *Daniels*, 306 F.3d at 460. So long as a taking "is rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause." *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 241 (1984). The Supreme Court has defined the concept of public use "broadly, reflecting [its] longstanding policy of deference to legislative judgments in this field." *Kelo v. City of New London*, 545 U.S. 469, 480 (2005). A public purpose is "a legislative decision" that "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Daniels,* 306 F.3d at 460. The "public use" requirement is satisfied if the government "rationally could have believed that the [taking] would promote its objective," even if it "may not be successful in achieving its intended goals." *Midkiff*, 467 U.S. at 242 (citing *Western & Southern Life Insurance Co. v. State Board of Equalization*, 451 U.S. 648, 671-672 (1981)). Even a transfer of property from one private party to another private party is permissible so long as it serves a public purpose. *See Kelo*, 545 U.S. at 482 ("'it is only the taking's purpose, and not its mechanics' . . . that matters in determining public use") (quoting *Midkiff*, 467 U.S. at 244).

The City could rationally have believed that the KCRO advances a public purpose. As stated in the ordinance's text, the purpose of the KCRO is "to protect and promote the health, safety, and welfare of [the City's] residents and mitigate the damaging effects on our communities of foreclosures, which individually are

catastrophic for the families and tenants who lose their homes, and collectively can economically destabilize an otherwise healthy neighborhood." Municipal Code of Chicago, Ill. § 5-14-010. In other words, the KCRO regulates the impact of foreclosures on tenants and neighborhoods by incentivizing incoming owners to improve the condition of often substandard residential buildings and negotiate reasonable lease terms with existing tenants, so that tenants will have reason to stay in the building rather than move (and thereby trigger the relocation payment). In addition, the KCRO helps tenants who vacate foreclosed buildings find alternative housing arrangements; the amount of the relocation assistance payment rationally reflects the costs of moving in the Chicago rental market (*e.g.* first month's rent, security deposit, moving costs for the relocation of personal property, lost income from taking time off from work). These are legitimate goals that the KCRO is rationally calculated to achieve.

BBLI believes that the City's policy choice is unwise, and it speculates that the relocation payments might not achieve the KCRO's stated purpose because tenants may not spend the money on relocation costs. BBLI Br. 18-19. But "whether in fact the provision will accomplish its objectives is not the question" in a public use analysis. *Midkiff*, 467 U.S. at 242; *see also Daniels,* 306 F.3d at 460. So long as the purpose of legislation is legitimate and its means are not irrational, "empirical debates over the wisdom of takings – no less than debates over the wisdom of other kinds of socioeconomic legislation – are not to be carried out in the federal courts." *Midkiff*, 467 U.S. at 243. And it is not irrational to surmise that departing tenants

in the Chicago rental market will need to find a new home and will incur significant expenses in the process.

BBLI also argues that the operation of the relocation assistance payment is akin to the "one-to-one transfer of property[] executed outside the confines of an integrated development plan" that the Court in *Kelo* said was "not presented in th[e] case," but would "raise a suspicion that a private purpose was afoot." 545 U.S. at 487; *see also* BBLI Br. 18-19. In *Kelo*, however, the Court was discussing a possible scenario where "citizen *A*'s property [was transferred] to citizen *B* for the sole reason that citizen *B* w[ould] put the property to a more productive use." 545 U.S. at 486-87. That hypothetical issue, which the Court did not resolve, bears little resemblance to the KCRO, which is not a targeted intervention into the ownership of property between two specific private individuals, but a general regulation of the foreclosed rental housing market designed to address a societal problem. BBLI's arguments are unavailing, and the KCRO's expressly stated purposes satisfy the public use requirement of the Takings Clause.

### D.    The KCRO does not violate the unconstitutional conditions doctrine.

Finally, the relocation assistance fee is not an impermissible exaction in violation of the unconstitutional conditions doctrine. *See* BBLI Br. 30-35. The unconstitutional conditions doctrine arises when the government is attempting to accomplish by coercion what the constitution prohibits it from doing directly. *Koontz*, 570 U.S. at 606. With respect to rights protected by the Takings Clause, the doctrine may prohibit the government from "pressur[ing] an owner into voluntarily

giving up property for which the Fifth Amendment would otherwise require just compensation" because "[e]xtortionate demands . . . frustrate the Fifth Amendment right to just compensation." *Id.* at 605. In two seminal cases – *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994) – the Supreme Court developed a test to address the "potential abuse of the permitting process." *Sheetz*, 601 U.S. at 275. Where the government places conditions on a building permit, the conditions must have an "essential nexus" and "rough proportionality" to the government's land-use interests. *Id.* at 275-76.

BBLI's unconstitutional conditions claim fails for several reasons. To start, BBLI is attempting to force its application in a context where it does not fit. Under the unconstitutional conditions doctrine, "the government may not require a person to give up a constitutional right – here the right to receive just compensation when property is taken for a public use – in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property." *Dolan*, 512 U.S. at 385. In other words, the doctrine applies only when the government attempts to circumvent the limits of what it can do directly under the Takings Clause by pressuring landowners to acquiesce to an indirect taking of property in exchange for a government benefit. *See Koontz*, 570 U.S. at 606 ("the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits"). Conversely, a regulation will not "fall under the unconstitutional-conditions umbrella" where, as here, it "does not conditionally grant or regulate the grant of a government benefit, such as

a permit." *Ballinger*, 24 F.4th at 1299-300; *see also Koontz*, 570 U.S. at 608 ("Virtually all of our unconstitutional conditions cases involve a gratuitous governmental benefit of some kind."). The KCRO does not condition the provision of any government benefit on any demand. It is instead a direct regulation imposed on a property owner.

In fact, the *Nollan/Dolan* test was designed to address abuses in the provision of a specific type of governmental benefit – a land-use permit. *See Sheetz*, 601 U.S. at 275 (*Nollan / Dolan* designed for "potential abuse of the permitting process"); *Koontz*, 570 U.S. at 604 ("*Nollan* and *Dolan* involve a special application of this doctrine . . . when owners apply for land-use permits.") (internal quotation marks omitted); *Cedar Point Nursery*, 594 U.S. at 161 (reiterating that test applies to property rights demanded "as a condition of receiving certain benefits" such as "a permit, license, or registration"). And we are aware of no case extending the rough-proportionality test of *Nollan/Dolan* outside the context of the land-use permitting process. *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 702 (1999) (observing *Nollan/Dolan* has not been used outside land-use permitting context). This case does not involve a property owner seeking a permit or any governmental benefit. This court should reject BBLI's efforts to invoke the *Nollan/Dolan* test beyond its intended application.

Moreover, "[a] predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing." *Koontz*, 570 U.S. at 612;

*see also Sheetz*, 601 U.S. at 280-81 (there is "an important threshold question to any application of *Nollan/Dolan* scrutiny: whether the permit condition would be a compensable taking if imposed outside the permitting context") (Sotomayor, J., concurring). Indeed, "*Nollan* and *Dolan* both involved dedications of property so onerous that, outside the exactions context, they would be deemed *per se* physical takings." *Lingle*, 544 U.S. at 547. Put another way, there can be no unconstitutional conditions claim if the government can achieve directly what it is indirectly pressuring the person to do. Here, the City can – and, indeed, is – directly regulating certain landowners by requiring them to negotiate lease renewals in good faith and make relocation assistance payments in certain instances. For the reasons previously discussed, that direct regulation of the landlord-tenant relationship does not effect an unconstitutional taking of the owners' property, per se or otherwise. This constitutional direct regulation, therefore, cannot form the basis of an unconstitutional conditions claim. *See Ballinger*, 24 F.4th at 1298.

For these reasons, the *Nollan/Dolan* test is a complete misfit in the context of this case. Pursuant to the *Nollan/Dolan* test, the government is allowed to condition approval of a government benefit on a "dedication of property" so long as "there is a 'nexus' and 'rough proportionality' between the property that the government demands and the social costs of the applicant's proposal." *Koontz*, 570 U.S. at 605-06. That test does not translate to the KCRO, which involves neither a governmental demand of property nor a governmental benefit. But even if the closest approximation of the "essential nexus" and "rough proportionality"

32

requirements are applied in this very different context, they are satisfied here. The KCRO imposes obligations on owners of foreclosed properties – to negotiate lease renewals in good faith and, when necessary, make relocation assistance payments – that have an essential nexus to the government's expressly stated goal of "mitigat[ing] the damaging effects on our communities of foreclosures." Municipal Code of Chicago, Ill. § 5-14-010. In addition, as we have explained, the amount of the relocation assistance payment is roughly proportional to what it costs to move in the Chicago rental market. At the same time, the payment is large enough to incentivize incoming owners to improve any substandard conditions of the foreclosed buildings and offer reasonable lease renewal terms to encourage tenants to stay in the building rather than uproot their lives to move. The relocation assistance fee, therefore, is not an unconstitutional exaction.

## CONCLUSION

———

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

MARY B. RICHARDSON-LOWRY
Corporation Counsel
  of the City of Chicago

s/ Ethan Merel
BY:   ETHAN MEREL
      Assistant Corporation Counsel
      2 N. LaSalle Street, Suite 580
      Chicago, Illinois 60602
      (312) 744-2497
      Ethan.Merel@cityofchicago.org

## CERTIFICATE OF COMPLIANCE

_____

In accordance with Fed. R. App. P. 32(g)(1), I certify that the foregoing brief complies with the type-volume limitation provided by Fed. R. App. P. 32(a)(7)(B)(i) and Circuit Rule 32(c). This brief contains 8,926 words, beginning with the words "Jurisdictional Statement" and ending with the words "Respectfully submitted" in the Conclusion section, as recorded by the word count of the Microsoft Word word processing system used to prepare the brief.

s/ Ethan Merel
ETHAN MEREL, Attorney

## CERTIFICATE OF FILING/SERVICE

_____

I certify that on September 10, 2025, I electronically filed the attached Brief of Defendant-Appellee with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

s/ Ethan Merel
ETHAN MEREL, Attorney