No. 25-1713

———————————

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————————

BBLI EDISON, LLC, a Delaware limited liability company,

Plaintiff – Appellant,

v.

CITY OF CHICAGO, Department of Housing,

Defendant – Appellee.

———————————

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
Honorable Mary M. Rowland, District Judge

———————————

**APPELLANT'S REPLY BRIEF**

———————————

CARA M. HOUCK
Holland & Knight LLP
150 N. Riverside Plaza
Suite 2600
Chicago, Illinois 60606
Telephone: (312) 715-5806
Cara.Houck@hklaw.com

J. DAVID BREEMER
*Counsel of Record*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
JBreemer@pacificlegal.org

*Attorneys for Plaintiff – Appellant BBLI Edison, LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................ii

INTRODUCTION............................................................................... 1

ARGUMENT ..................................................................................... 3

  I.  A Demand for Money Takes Property, Especially When, as Here, It Limits the Possession of Real Property ....................................... 3

    A. The City fails to negate the historical evidence showing that money is property ................................................................ 3

    B. *Eastern Enterprises* and *Koontz* demonstrate that a demand for money implicates protected "property," when, as here, it operates upon real property interests ......................................... 5

  II.  The City Has Failed to Negate BBLI's Claim That the Payment Requirement Effects a Per Se Taking........................... 10

    A. The City's physical takings defenses fail ................................. 11

    B. The fact that the taking arises from regulation does not change its character as a physical taking ................................. 12

    C. The City cannot avoid takings liability by characterizing the taking of BBLI's funds as a "cost of doing business" akin to requiring "smoke detectors" ......................................... 16

    D. The burden on BBLI's property interests amounts to a regulatory taking....................................................................... 17

    E. The taking effected by the tenant payment is unconstitutional because it is for a private use and/or lacks just compensation ................................................. 20

    F. *Nollan* and *Dolan* apply when, as here, a payment requirement functions like a condition or exaction on the use of real property....................................................... 22

CONCLUSION ................................................................................. 24

CERTIFICATE OF COMPLIANCE....................................................... 25

i

# TABLE OF AUTHORITIES

## Cases

*Armstrong v. United States,*
  364 U.S. 40 (1960)................................................................3

*Ballinger v. City of Oakland,*
  24 F.4th 1287 (9th Cir. 2022) ......................................14-15

*Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment,*
  477 U.S. 41 (1986)............................................................4-5

*Cedar Point Nursery v. Hassid,*
  594 U.S. 139 (2021).....................................2, 10-14, 16-17

*Cities Serv. Co. v. McGrath,*
  342 U.S. 330 (1952) ...........................................................4

*Dickman v. Comm'r,*
  465 U.S. 330 (1984)............................................................5

*Dolan v. City of Tigard,*
  512 U.S. 374 (1994)..........................................................22

*Eastern Enterprises v. Apfel,*
  524 U.S. 498 (1998)..........................................................5-7

*Hawaii Housing Authority v. Midkiff,*
  467 U.S. 229 (1983) ..........................................................21

*Horne v. Dep't of Agric.,*
  576 U.S. 350 (2015)............................................................2

*Koontz v. St. Johns River Water Management District,*
  570 U.S. 595 (2013).....................................................1-2, 8-9

*Lingle v. Chevron U.S.A. Inc.,*
  544 U.S. 528 (2005).....................................................17-18

*Marks v. United States,*
  430 U.S. 188 (1977)............................................................6

*Nollan v. California Coastal Commission,*
  483 U.S. 825 (1987)..........................................................22

*Palazzolo v. Rhode Island,*
  533 U.S. 606 (2001) ..................................................................... 19-20

*Tyler v. Hennepin Cnty.,*
  598 U.S. 631 (2023) ............................................................................ 9

*United States v. Williams,*
  504 U.S. 36 (1992) ............................................................................ 11

*Webb's Fabulous Pharmacies, Inc. v. Beckwith,*
  449 U.S. 155 (1980) ............................................................................ 5

*Yee v. City of Escondido,*
  503 U.S. 519 (1992) .......................................................................... 14

## Statutes

Ill. Comp. Stat. 5, § 4-8 ......................................................................... 22

Ill. Comp. Stat. 5, § 4-21 ....................................................................... 22

## Other Authorities

Larkin, Jr., Paul J., *The Original Understanding of "Property"
  in the Constitution*, 100 Marq. L. Rev. 1 (2016) ................................... 4

Treanor, William Michael, *The Original Understanding of
  the Takings Clause and the Political Process,*
  95 Colum. L. Rev. 782 (1995) ............................................................... 4

## INTRODUCTION

In its Brief on Appeal, Appellee City of Chicago (City) contends that its one-of-a-kind ordinance (KCRO) requiring Appellant BBLI Edison, LLC (BBLI), and other foreclosed rental owners to pay $10,600 to every tenant who voluntarily exits a lease is exempt from the Takings Clause. Indeed, the City contends the ordinance's extraction of owner funds does not even affect protected private property interests. If private property interests are at issue (they are), the City contends it is not a "taking" to require BBLI to transfer large amounts of its private funds to tenants. To the City, this burden on BBLI's property interests is just a "cost of doing business" that it must swallow without Takings Clause protection. City's Brief at 11.

The City is mistaken on all points. With respect to the issue of whether BBLI's money is "property," the City utterly fails to negate the evidence that the founding generation considered money to be protected property. *See* Opening Brief at 13-15. The City also fails to properly understand and apply the Court's decision in *Koontz v. St. Johns River Water Management District*, 570 U.S. 595 (2013), which held that the

Takings Clause applies when, as here, a monetary demand impacts the use of real property. *Id.* at 613-14.

The City's claim that appropriating foreclosed property owner funds it is not a "taking" is equally incorrect. The Supreme Court has made clear that a per se taking results when regulatory action permanently appropriates a property right. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149-52 (2021). The City offers no plausible reason why this principle does not apply when an ordinance strips the owner of its possessory interest.

The Supreme Court has also made clear that a regulatory scheme can effect a physical taking as easily as a completed physical intrusion, and that such a taking occurs when, as here, the government appropriates property for the use of third parties. *Cedar Point Nursery*, 594 U.S. at 149. The Court has also already rejected the City's argument that courts should treat a regulatory burden that otherwise qualifies as a taking as a permissible "cost of doing business." *Horne v. Dep't of Agric.*, 576 U.S. 350, 365-66 (2015).

The City's position would allow the government to commandeer an unlimited amount of money from regulated rental property owners,

destroying their rights of possession, exclusion, and use, without running afoul of the Takings Clause. This overbroad and extreme view of the Takings Clause is not consistent with the views of the constitutional framers or with Supreme Court precedent. The Takings Clause is meant "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). The City's statutory command that BBLI pay $10,600 to any and all of its 200+ tenants who would rather receive BBLI's money than a new lease is an unconstitutional taking of property that violates the Takings Clause's basic purpose.

## ARGUMENT

### I.

### A Demand for Money Takes Property, Especially When, as Here, It Limits the Possession of Real Property

#### A. The City fails to negate the historical evidence showing that money is property

The City contends that the money which the KCRO requires BBLI to turn over to voluntarily departing tenants is not "property" subject to the Takings Clause. This is inaccurate. As explained in the Opening Brief, the founding generation recognized that money is just as much

3

"property" as other personal property and real property interests. *See*
Opening Br. at 13-15; *see also*, William Michael Treanor, *The Original*
*Understanding of the Takings Clause and the Political Process*, 95
Colum. L. Rev. 782, 827 (1995) ("assets, whether tangible or intangible,
were described as property" by the founding generation); Paul J.
Larkin, Jr., *The Original Understanding of "Property" in the*
*Constitution*, 100 Marq. L. Rev. 1, 6 (2016) ("[T]he Founder's generation
understood that 'property' included the right to possess, use, enjoy, and
dispose of whatever land, commodities, and *currency* (or its equivalent)
a man owned.") (emphasis added).

The Supreme Court has also repeatedly confirmed that monetary
interests are constitutionally protected "property" interests. *See Cities*
*Serv. Co. v. McGrath*, 342 U.S. 330, 335 (1952) (holding that if a
judgment requires "a *payment* of which would effect a double recovery
. . . petitioners will have the right to recoup from the United States, for
a 'taking' of their *property* within the meaning of the Fifth
Amendment") (emphasis added); *Bowen v. Pub. Agencies Opposed to*
*Soc. Sec. Entrapment*, 477 U.S. 41, 55 (1986) ("Congress does not have
the power to repudiate its own *debts*, which constitute '*property*' to the

lender, simply in order to save money.") (emphasis added); *Dickman v. Comm'r*, 465 U.S. 330, 336 (1984) (The Court "ha[s] little difficulty accepting the theory that the use of valuable *property*—in this case *money*—is itself a legally protectible property interest.") (emphasis added); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980) (The "earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property.").

Unable to negate this constitutional tradition, the City claims that money is only "property" if and when it is kept in an identifiable "pot." City's Br. at 13. But the writings of the constitutional framers establish no such distinction, and the Supreme Court's precedent has not adopted such a view. Nor is there any logic to the idea. How does the failure to segregate funds erase its character as property? The City never explains.

**B. *Eastern Enterprises* and *Koontz* demonstrate that a demand for money implicates protected "property," when, as here, it operates upon real property interests**

The City does point to the Supreme Court's split decision in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998). City's Br. at 15. But *Eastern Enterprises* is of no help to the City. First, the controlling plurality

5

decision in *Eastern Enterprises* does *not* hold that a government

demand for money does not involve protected "property" interests.

Indeed, the Justices in the plurality treated the monetary appropriation

challenged in *Eastern Enterprises* as an issue of constitutionally

protected property. 524 U.S. at 534 ("the Coal Act operates

retroactively, divesting Eastern of *property*") (emphasis added).

The City accordingly does not rely on the *Eastern Enterprises*

plurality opinion, but on Justice Kennedy's concurring opinion and a

*dissenting* opinion. Of course, dissenting opinions are not part of a

court's "holding," even in a fractured decision. *See generally Marks v.*

*United States*, 430 U.S. 188 (1977).

Moreover, Justice Kennedy's concurring *Eastern Enterprises* opinion

supports BBLI's contention that taking money from real property

owners takes "property." In his *Eastern Enterprises* concurrence, Justice

Kennedy explained that he did not view the challenged monetary

obligation in *Eastern Enterprises* as involving "property" because "[i]t

does not operate upon or alter an identified property interest, and it is

not applicable to or measured by a property interest. The [] Act does not

appropriate, transfer, or encumber an estate in land . . . ." 524 U.S. at
540 (Kennedy, J., concurring).

But in this case, those factors are met. The whole point of the KCRO
is to "operate upon" the use of foreclosed real properties. App. to
Opening Br. at 2 ("it is the purpose of this chapter . . . to preserve,
protect, maintain, and improve rental *property* and *prevent occupied
buildings from becoming vacant* after foreclosures.") (emphasis added).
The KCRO requires owners of foreclosed property to register with the
City, ensuring that the KCRO's tenant payment requirement will
impact their property. App. to Opening Br. at 8. The KCRO's tenant
payment requirement is thus "applicable" based on the ownership of a
particular type of real property (foreclosed, rental property). *Eastern
Enterprises*, 524 U.S. at 540 (Kennedy, J., concurring). Furthermore,
the law "alters" the use and leasing of foreclosed rental property. In the
City's words, it "incentiviz[es] incoming owners to . . . negotiate
reasonable lease terms with existing tenants." City's Br. at 28.
Therefore, under Justice Kennedy's *Eastern Enterprises* opinion, the
tenant payment mandate affects protected "property." 524 U.S. at 540
(Kennedy, J., concurring).

If any doubt remained, in *Koontz*, the Court confirmed that a monetary demand linked to the use of real property qualifies as a per se taking of property. It is true that *Koontz* involved a claim that requiring a would-be developer to pay an impact fee violated the unconstitutional conditions doctrine in *Nollan* and *Dolan*. But in addressing that issue, the *Koontz* Court had to answer the predicate question of whether the demand for money would be a taking if imposed outside the land use permitting context. 570 U.S. at 611-12. This in turn required the Court to address whether a demand for money involves protected "property." *Id.* at 613.

Reviewing *Eastern Enterprises*, the *Koontz* Court held that the monetary payment in *Koontz* satisfied Justice Kennedy's understanding of protected property interests in *Eastern Enterprises* because there was a "direct link between the government's demand [for money] and a specific parcel of real property." *Koontz*, 570 U.S. at 614. A direct link exists in this case as well. The KCRO's tenant payment requirement plainly burdens BBLI's ownership and use of foreclosed rental property at 5200 N. Sheridan Road, Chicago, Illinois, just as it was designed to do.

8

Nevertheless, the City seems to argue that the text of challenged law must explicitly identify and target a particular parcel of property to create a *Koontz*-like link between property and a monetary demand. But nothing in *Koontz* or *Eastern Enterprises* hinges application of the Takings Clause on whether a challenged law explicitly targets a named parcel.[1] All that is required is a connection between the monetary demand and the exercise of real property interests. *Koontz*, 570 U.S at 614; *Tyler v. Hennepin Cnty.,* 598 U.S. 631, 639-47 (2023) (a statutory scheme that did not identify particular parcels caused a per se taking in confiscating $25,000 in home equity). Here, the KCRO is linked to the ownership and use of BBLI's foreclosed property. Therefore, even if a "general" demand to pay money outside the taxation context does not implicate "property" (a proposition BBLI disputes), a demand, such as that here, linked to real property rights does.[2]

---

[1] Further, the idea makes no sense. Property-related legislation normally does not and cannot target particular parcels, and requiring parcel-specific targeting would turn the question of whether there is a link between a monetary demand and real property into a test of whether legislation drafters are foolish enough to name specific parcels.

[2] It is true that taxes and user fees generally do not cause an unconstitutional taking. But this outcome does not rest on the faulty and a-historical conclusion that money is not "property." The understanding instead rests on the fact that (1) the taxation power is a

## II.

### The City Has Failed to Negate BBLI's Claim That the Payment Requirement Effects a Per Se Taking

The City argues that, even if BBLI's money is "property," the KCRO's tenant payment requirement does not cause a physical or regulatory "taking" of that property. It is wrong on both counts.

At the outset, BBLI notes that the City misconstrues BBLI's takings claims as solely "facial" claims. But BBLI has asserted its claims as both facial and as-applied takings claims. *See* DE 8 (Amended Complaint) at 19, ¶ 115 ("There is a justiciable controversy in this case as to whether the relocation fee provision . . . violates the U.S. Constitutional Fifth and Fourteenth Amendments, both facial and *as applied* to Plaintiff in this case.") (emphasis added); *id.* at 15, ¶ 80 ("Plaintiff lacks an adequate remedy at law to address the unlawful and unconstitutional taking of *its property* through the City of Chicago's *enforcement* of the relocation fee provision"); *id.* at 15, ¶ 84. Moreover,

---

traditional "background principle" of property law that functions as an exception to the Takings Clause, *Cedar Point*, 594 U.S. at 161, and (2) taxes and user fees provide compensation to the subject parties in the form of reciprocal benefits. Thus, although taxes and use fee schemes impact and take protected "property" (i.e., money), they are not treated as *unconstitutional* takings.

10

the district court addressed BBLI's claims as as-applied claims and did
not describe or treat the claims as solely facial in nature. *See* App. to
Opening Br. at 22-26. BBLI's as-applied takings arguments are
properly before this Court, regardless of how the City reads its claims.
*United States v. Williams*, 504 U.S. 36, 41-42 (1992) (an issue passed
upon below is properly before an appellate court).

### A.  The City's physical takings defenses fail

"Whenever a regulation results in a physical appropriation of
property, a per se taking has occurred." *Cedar Point*, 594 U.S. at 149.
Such a per se, physical taking results when the government authorizes
third parties to invade a property interest. *Id.* Such an invasion is often
apparent when government action destroys a property owner's right of
exclusive possession. *Id.* at 149-52.

In this case, the KCRO destroys BBLI's common law right to possess
its monetary interests, and its associated right to exclude others from
its use, by authorizing voluntarily exiting tenants to possess $10,600 of
BBLI's funds per tenant for their own uses. This is an appropriation of
a core property right and thus, a classic physical taking. *Cedar Point*,
594 U.S. at 149–50, 152. Indeed, there is no circumstance in which the

KCRO's tenant payment mandate can be applied without causing a per se taking because the dynamics are the same in each case: tenants are authorized by the KCRO to possess and use $10,600 of a foreclosed rental owner's funds, stripping the owner of its own right of possession and exclusive use of its monetary interests. BBLI thus states a claim that the KCRO takes property on its face and as applied to BBLI.

Nevertheless, the City argues that compelling owners like BBLI to transfer money to voluntarily departing tenants does not effect a physical taking because (1) the taking is effected by a regulatory scheme, which the City believes is exempt from the Takings Clause, and (2) requiring BBLI to make tenant payments is just a "cost of doing business" that can be imposed without takings liability, in the same way owners can be required to supply health and safety equipment. Neither argument has merit.

## B. The fact that the taking arises from regulation does not change its character as a physical taking

Initially, the City suggests that physical takings rules do not apply to the KCRO's taking of BBLI's funds because the taking arises from a regulatory scheme, rather than a physical ouster. But the Supreme Court rejected this distinction in *Cedar Point*, 594 U.S. at 149. There,

the Court held that a regulatory scheme that gave third parties access
to private property caused a per se, physical taking. *Cedar Point*
explains that "Government action that physically appropriates property
is no less a physical taking because it arises from *a regulation*." *Id.*
(emphasis added). The decision further notes:

> The essential question is not . . . whether the government
> action at issue comes garbed as a regulation (or statute, or
> ordinance, or miscellaneous decree). It is whether the
> government has physically taken property for itself or
> someone else—by whatever means—or has instead restricted
> a property owner's ability to use his own property. Whenever
> a regulation results in a physical appropriation of property, a
> per se taking has occurred . . . .

*Id.* The City's repeated claim that the taking of BBLI's money cannot be
treated as a physical taking because it arises from a regulatory scheme
is without merit.

Still, the City doubles down on its position by suggesting that
regulation of "landlord-tenant relations" are never subject to per se
takings rules. City's Br. at 9-10. In effect, the City claims there is a
gaping loophole in physical takings standards when government action
targets rental property. But no such exception exists. As noted above,
*Cedar Point* makes clear that physical takings rules do not hinge on the

*kind* of government action at issue, but its *effect* on the property. *Cedar Point*, 549 U.S. at 149.

The City points to a rent control takings case, *Yee v. City of Escondido*, 503 U.S. 519 (1992), to support its contention that regulations affecting the "landlord-tenant relationship," including the KCRO, are immune from physical takings tests. City's Br. at 10-12. But the analogy to rent control is inapt here. Rent control regulations cause property owners to enjoy smaller future profits than they would without rent control, but they still profit and benefit. The owner is still able to lease his property for financial gain. He gains less, but does not lose anything.

The tenant payment requirement has the opposite effect. It takes BBLI's existing property (its funds) without any off-setting benefit to it. Tenants can choose to walk away from their lease and take BBLI's money, leaving it with both vacant units and a million dollar or more hole in its pocket. Rent control cases like *Yee* have no bearing on this situation.

The City also points to *Ballinger v. City of Oakland*, 24 F.4th 1287 (9th Cir. 2022). But again, the case is not on point, and in any event,

14

*Ballinger* is not binding on this Court. *Ballinger* involved a challenge to a tenant relocation payment requirement triggered by a landlord's decision to *evict* tenants. The Ninth Circuit held the payment requirement was not subject to per se takings analysis primarily because the court did not find a clear link between the payment requirement and real property interests. The *Ballinger* court explained that the money demand in that case "was a monetary obligation triggered by the owner's actions with respect to use of their property [i.e., evicting tenants], not a burden on the property owner's interest in the property." *Id.* at 1296-97.

Here, on the other hand, the KCRO's relocation payment requirement is not triggered by any owner action, like eviction. It is designed to apply and does apply to impact and alter the ownership and use (leasing) of foreclosed properties. Unlike in *Ballinger*, the KCRO tenant payment mandate intentionally burdens real property interests. *Ballinger* is inapposite.

## C. The City cannot avoid takings liability by characterizing the taking of BBLI's funds as a "cost of doing business" akin to requiring "smoke detectors"

Finally, the City claims that forcing BBLI to pay $10,600 to every tenant who voluntarily refuses a new lease is just another constitutionally permissible business expense, akin to requiring rental owners to pay for "smoke detectors," "security locks," "refuse containers," and the like. City's Br. at 11 n.2. But forcing rental property owners like BBLI to give voluntarily departing tenants their money is much different than requiring them to supply health- and safety-related equipment.

First, the need for safety equipment in a rental building is necessitated by an owner's decision to lease the property to tenants. In contrast, the need for the KCRO's tenant relocation payment is not caused by passive ownership of a foreclosed building. To the extent the need exists, it is caused by the tenants' own choice to exit a lease. In short, requiring safety equipment is reasonably connected to rental property ownership, but extracting money for tenants who voluntarily leave is not. *See Cedar Point*, 594 U.S. at 161-62 (explaining that health

and safety regulations will normally not cause a taking because they are typically related to the impacts of property use).

Second, requiring rental property owners to provide basic health and safety equipment is an established "background principle" of state property law. *Cf. Cedar Point*, 594 U.S. at 160-61. In contrast, the City does not dispute that the KCRO's tenant payment requirement is a novel, first-of-its-kind imposition, the only ordinance of its kind in the nation.

The bottom line is that, on its face and as applied, the KCRO physically appropriates BBLI's money for the benefit of third parties (i.e., tenants). This is a per se taking. *Id.* at 149.

### D. The burden on BBLI's property interests amounts to a regulatory taking

The City disagrees with BBLI's articulation of the factors relevant to whether the KCRO's tenant payment requirement effects a "regulatory" taking. But it cannot dispute the essential purpose of regulatory takings analysis: "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). Given this purpose, the paramount

17

consideration in regulatory takings analysis is "the severity of the burden that government imposes upon private property rights." *Id.*

As BBLI has alleged, the relocation payment provision "imposes an impermissible burden" on its property rights. DE 8 at 3, ¶ 10. Indeed, even if the tenant payment requirement is not a classic physical taking, it is certainly "functionally equivalent" to such a direct appropriation, for the reasons outlined in prior sections, including that it destroys BBLI's right to exclude others. The KCRO provision causes a regulatory taking on that basis alone. *Lingle*, 544 U.S. at 539.

There are additional economic and property impacts. Under the KCRO, lenders (including BBLI) who own a building of 200 or more units are looking at "paying an additional two to four million dollars to foreclose that building and take ownership." DE 8 at 5-6, ¶ 21. The $10,600 payment that BBLI is compelled to give departing tenants is approximately seven times the average monthly rent that tenants pay for a unit in BBLI's building. This is a severe burden on property ownership that tilts the regulatory takings inquiry in BBLI's favor. *Lingle*, 544 U.S. at 539.

The City seems to think, however, that BBLI's regulatory takings claim fails because it acquired its real property after enactment of the KCRO, and was thus on notice of the KCRO's tenant payment provision. But the Supreme Court considered and rejected this defense in *Palazzolo v. Rhode Island*, 533 U.S. 606, 626-28 (2001). There, the Court explained:

> Just as a prospective enactment, such as a new zoning ordinance, can . . . effect[]a taking because it can be understood as reasonable by all concerned, other enactments are unreasonable and *do not become less so through passage of time or title*. Were we to accept the State's rule, the post enactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable. A State would be allowed, in effect, to put an expiration date on the Takings Clause.

*Palazzolo*, 533 U.S. at 627 (emphasis added).

The Court emphasized that the so-called "notice" defense to a takings claim is particularly improper where the property owner could not have asserted a takings claim when the challenged government action initially occurred. "It would be illogical, and unfair, to bar a regulatory takings claim because of the post-enactment transfer of ownership where the steps necessary to make the claim ripe were not taken, *or*

19

*could not have been taken, by a previous owner.*" *Id.* at 628 (emphasis added).

That situation exists here. When the KCRO came into existence in 2021, the owner of BBLI's property at that time could not have challenged the tenant payment mandate because the property was not yet *foreclosed* and, thus, the KCRO did not injure the owner. BBLI also could not have challenged the KCRO provision in 2021 because it did not own the property then and was thus not harmed by the payment provision. BBLI challenged the KRCO as soon as it could: after it took ownership of the foreclosed property and became subject to the tenant payment mandate. Under these circumstances, BBLI's regulatory takings claim is not hindered, much less defeated, because the KCRO predates BBLI's ownership. *Palazzolo*, 533 U.S. at 627.

### E. The taking effected by the tenant payment is unconstitutional because it is for a private use and/or lacks just compensation

The City concedes that, if BBLI states a claim that the KCRO's tenant payment requirement effects a taking of property (and it does), it necessarily states a claim for an *unconstitutional* taking because "the KCRO undisputably does not provide a mechanism for compensation."

City's Br. at 26. Therefore, even if the Court concludes that the tenant payment serves a valid "public use," an issue discussed further below, the City's concession as to the lack of compensation confirms that BBLI states a valid unconstitutional takings claim.

However, contrary to the City's position, the KRCO also effects an unconstitutional taking because it fails to advance a valid "public use." The City states that legislation satisfies the Taking Clause's "public use" requirement "as long as the purpose of the legislation is legitimate and its means are not irrational." City's Br. at 28 (citing *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 242 (1983)). Assuming this is the test, the City cannot satisfy it.

The City asserts that the KCRO's tenant payment rationally serves the goal of ensuring that tenants who leave a lease will obtain replacement housing. But it is not rational to think that tenants suddenly gifted by the government with thousands of dollars in unregulated, unconstrained, and untracked landlord funds will use it for housing. The City points to no evidence or findings along these lines, and the idea defies reason. Certainly, when the government doles out its money to individuals for specific purposes, it does not hand the

recipients a blank check. It imposes requirements, conditions, prohibitions, and accountability safeguards on the use of its funds. *See, e.g.*, 305 Ill. Comp. Stat. 5, § 4-8 (Mismanagement of assistance grant under Illinois' Temporary Assistance for Needy Families (TANF) program); 305 Ill. Comp. Stat. 5, § 4-21 (Sanctions for recipients failing to comply with program requirements).

Rational programs include such requirements to ensure that funds granted under the program serve program purposes. Yet, the KCRO imposes no conditions on how, where, and when tenants can use the thousands of dollars they take from owners like BBLI. It includes no tracking or accountability mechanisms that would incentivize or ensure that recipients use the funds for relocation or other housing purposes. That is not a rational means to advance the City's alleged tenant housing goals.

### F. *Nollan* and *Dolan* apply when, as here, a payment requirement functions like a condition or exaction on the use of real property

The City contends that the unconstitutional conditions tests set out in *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994), do not apply to the tenant

payment requirement because this case does not involve a challenge to a literal land use "permit." The City believes a permit dispute is necessary to trigger review under *Nollan* and *Dolan*. But the *Nollan* and *Dolan* unconstitutional conditions doctrine is not so rigid. The doctrine applies when a literal permit condition is at issue and when a regulatory requirement functions as a condition on the lawful use of private property.

Here, the tenant payment requirement is the functional equivalent of a land use permit condition. BBLI cannot lawfully operate and use its foreclosed property owned in Chicago except on the condition that it pays departing tenants $10,600 each. Since the payment requirement functions like a land use condition and exaction, it should be, and is, subject to the *Nollan/Dolan* "nexus" and "roughly proportionate" tests. It fails these tests for the reasons stated in the Opening Brief. Opening Br. at 30-35.

## CONCLUSION

The Court should reverse the district court's decision and remand for further proceedings.

DATED: September 26, 2025.

Respectfully submitted,

/s/ J. David Breemer

| | |
|---|---|
| CARA M. HOUCK | J. DAVID BREEMER |
| Holland & Knight LLP | *Counsel of Record* |
| 150 N. Riverside Plaza | Pacific Legal Foundation |
| Suite 2600 | 555 Capitol Mall, Suite 1290 |
| Chicago, Illinois 60606 | Sacramento, California 95814 |
| Telephone: (312) 715-5806 | Telephone: (916) 419-7111 |
| Cara.Houck@hklaw.com | JBreemer@pacificlegal.org |

*Attorneys for Plaintiff – Appellant BBLI Edison, LLC*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with Federal Rule of Appellate Procedure 32(a)(7)(B) and the Seventh Circuit's Local Rule 29, because this brief contains 4,596 words, excluding items enumerated in Federal Rule of Appellate Procedure 32(f). I relied on my word processor, Microsoft Word, to obtain the count.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a Century Schoolbook 14 point font.

DATED: September 26, 2025.

s/ J. David Breemer
J. DAVID BREEMER